1  PATRICK R. COSTELLO
   Florida Bar No. 75034
2  Email: costellop@sec.gov
3  SECURITIES AND EXCHANGE COMMISSION
   100 F Street N.E.
4  Washington, DC 20549-5985
5  Telephone: (202) 551-3982
   Facsimile: (202) 772-9245
6  Attorney for Plaintiff

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | Case No. **'16CV1013 WQHNLS** |
| Plaintiff, | |
| vs. | **COMPLAINT** |
| ASHER Z. ZWEBNER, | |
| Defendant. | |

Plaintiff Securities and Exchange Commission alleges:

**I.  INTRODUCTION**

1. The Commission brings this action to enjoin Defendant Asher Z. Zwebner ("Zwebner") from violating the antifraud provisions of the federal securities laws. From no later than September 2010 through December 2011, Zwebner engaged in a scheme to create a publicly-traded shell company, Crown Dynamics Corp. ("Crown"), through a sham registered initial public offering ("IPO").

2. Zwebner secretly controlled every aspect of Crown's registration and the IPO. He filed a false Form S-1 registration statement with the Commission on behalf of the company, and after the registration became effective, placed Crown's free-trading shares with nominees residing in Israel, most of whom were unaware of their role as nominees. Zwebner then gained physical control of their stock certificates. He subsequently engaged a U.S. broker-dealer to submit to the Financial Industry Regulatory Authority ("FINRA") a false Form 15c2-11under Rule 15c2-11 of the Exchange Act, 17 CFR § 240.15c2-11, so that Crown's common stock would be quoted on the Over-the-Counter Bulletin Board ("OTCBB") and the OTC Link (an SEC-registered Alternative Trading System).

3. Throughout the registration process, Zwebner omitted to disclose his control over Crown, made false statements about Crown's business purpose and plans, and used unwitting nominees as the purported IPO purchasers. After Zwebner registered Crown's offering and arranged for its stock to trade on the OTCBB and on OTC Link, he secretly sold the Crown shell to stock promoter Christopher D. Larson ("Larson").

4. As a result of the conduct alleged in this Complaint, Zwebner violated Section 17(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77(q)(a); and Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5. Unless restrained and enjoined, Zwebner is reasonably likely to continue to violate the federal securities laws.

## II. DEFENDANT AND RELATED ENTITIES AND INDIVIDUALS

### A. Defendant

5. Zwebner, age 52, is a dual British and Israeli citizen and resides in Jerusalem, Israel. During the relevant time period, he purported to be an accountant and consultant who organized companies that traded on the U.S. over-the-counter market. Zwebner declined to testify before the Israeli Securities Authority in

connection with the Commission's investigation based on his Fifth Amendment privilege against self-incrimination.

### B. Related Entities and Individuals

6. During the relevant time period, Crown was a Delaware corporation. On or about September 21, 2010, in its initial public offering registration statement, Crown claimed it planned to develop a patent for a toothbrush. After its registration became effective, the company's stock began trading under the symbol CDYY and, in January 2012, Crown announced a new product – an electronic monitoring device called PomCom. During the relevant time period, Crown stock traded in the U.S. on the over-the-counter market, and its IPO shares were issued in the U.S. by a U.S. registered transfer agent. U.S. investors purchased and sold shares here and through U.S. broker-dealers. Later in 2012, Crown merged into Airware Labs Corp.

7. Larson, age 44, resides in Arizona. During the relevant time period, he purchased the Crown shell from Zwebner. The Commission has filed a separate action against Larson.

## III. JURISDICTION AND VENUE

8. The Court has jurisdiction over this action pursuant to Sections 20(b), 20(d) and 22(a) of the Securities Act, 15 U.S.C. §§ 77t(b), 77t(d) and 77v(a); and Sections 21(d) and 27(a) of the Exchange Act, 15 U.S.C. §§ 78u(d) and 78aa(a).

9. The Court has personal jurisdiction over Zwebner and venue is proper in this District because, among other things, many of the acts and transactions constituting the violations alleged in this Complaint occurred in this District. In addition, venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events giving rise to the Commission's claims occurred here.

10. In connection with the conduct alleged in this Complaint, Zwebner, directly and indirectly, singly or in concert with others, has made use of the means or instrumentalities of interstate commerce, the means or instruments of

transportation or communication in interstate commerce, the mails, and/or the facilities of a national securities exchange.

## IV. FACTUAL BACKGROUND

### A. Zwebner Registers Crown's IPO

11. Crown was incorporated in Delaware in June 2010, purportedly by an Israeli named Amir Rehavi ("Rehavi"). In reality, Rehavi was Zwebner's nominee and was unaware his name was associated with Crown or its securities. The record owners of the company's stock were Rehavi and another officer, Chana Zehavi ("Zehavi"). Crown purportedly issued 1.5 million shares each to Rehavi and Zehavi shortly after the company was incorporated. In reality, however, Zwebner controlled all three million shares.

12. Two months after Crown was incorporated, Zwebner retained a U.S. transfer agent to handle the issuance and cancellation of Crown's share certificates. Thereafter until he sold the Crown shell to Larson, Zwebner was the sole Crown representative who communicated with the transfer agent.

13. Zwebner misrepresented to the transfer agent that Rehavi was Crown's CEO. Crown's agreement with the transfer agent purported to be signed by Rehavi and witnessed by a New York County notary. In reality, both Rehavi's and the notary's signatures were forged on the document. In September 2010, at Zwebner's instruction, the transfer agent shipped Rehavi's and Zehavi's share certificates to Zwebner rather than to them as the named shareholders.

14. On September 21, 2010, Crown filed a Form S-1 Registration Statement with the Commission and, over the next year in response to the Commission's comments, filed seven amendments. Zwebner managed every aspect of the securities registration process. He worked with a U.S. securities attorney to prepare the Form S-1 and amendments thereto and respond to questions raised in the Commission's comment letters. Zwebner also worked with a firm he hired to file the Form S-1 and other reports with the Commission.

15. According to the third amendment to the Form S-1, filed on May 12, 2011, Crown acquired a patent for a toothbrush that it planned to license to third-parties which would "design, manufacture and market a product based on the Patent . . . ."

16. Despite Zwebner's control of the company and its registration process, his name did not appear anywhere in the Form S-1 or subsequent filings with the Commission. Zwebner's conduct was illegal because Items 401(a) and 404(c) of Regulation S-K, 17 CFR §§ 229.401(a) and 229.404(c), require disclosure of officers, directors, promoters, and control persons and related transactions conducted by them to be included as part of any Form S-1 filing. Zwebner knew, or was reckless in not knowing, that Crown's Form S-1 should have disclosed his control of the company and ownership of its stock, but omitted to do so.

17. While Crown's request to register its securities was pending with the Commission, Zwebner disguised himself as Crown's nominal CEO, Rehavi, so the Commission would send its comment letters to him rather than Rehavi. To accomplish this deception, on June 27, 2011, Zwebner created an email account that had the address: amir.rehavi@gmail.com. The same day, Zwebner told company counsel to provide the address to the Commission examiner who was reviewing the Form S-1. As requested by Zwebner, on July 11, 2011, counsel sent the address to the Commission. Thereafter, the Commission emailed three comment letters to that address, each of which was addressed to Amir Rehavi. Because the email account belonged to Zwebner, it was he – rather than Amir Rehavi – who received the letters from the Commission. When the Commission sent the letters to that address, it was unaware it was communicating with Zwebner rather than Rehavi, the intended recipient of the communication.

18. Zwebner arranged to sell the Crown shell even before its registration became effective. On August 22, 2011, Crown filed its seventh (and final) amendment to the Form S-1. The amendment misrepresented that management did

"not have any current intentions, negotiations, or arrangements to merge or sell the Company." The statement was false because Zwebner had already arranged to sell the company: just six days after filing the amendment, Zwebner notified Crown's outside auditor that the Crown shell had been sold and the transaction would close in approximately two months. Zwebner therefore knew, or was reckless in not knowing, that the amendment falsely disclosed there were no plans to sell the company.

19. On September 7, 2011, relying on the accuracy of the amendment, the Commission declared Crown's registration effective. When the Commission allowed the registration to go effective, it was unaware Zwebner was the company's undisclosed principal and that he already had arranged to sell the company – including its free-trading shares that were supposed to be offered to public investors in a not-yet-commenced IPO. Once the registration became effective, Crown could commence its IPO.

**B. Zwebner and his Son Create a Fictitious IPO Subscriber List**

20. The next step in the scheme was to create freely-tradable shares that would make Crown valuable to stock manipulators who might purchase the Crown shell. To that end, Zwebner orchestrated a sham IPO pursuant to which he caused shares to be issued to his nominees. In reality, however, Zwebner owned and controlled the IPO shares both before and after the IPO.

21. The final amendment to the Form S-1 described the procedures for subscribing to the IPO that Zwebner never intended to follow. The procedures stated that investors wishing to purchase IPO shares would be required to submit a subscription agreement and deliver funds to Crown for the purchase. Instead of conducting a real IPO, Zwebner engaged in an elaborate charade to make it appear that Crown had done so. Zwebner and his son persuaded acquaintances to hand over unsigned photocopies of their blank personal checks. In doing so, Zwebner

and his son hid from them the fact that they would be identified as Crown's IPO subscribers and that Crown stock certificates would be issued in their names.

22. Once Zwebner had the checks, he or his son forged the payor signatures, inserted "Crown Dynamics Corp" as the payee, and inserted $1,875 as the payment amount. In many if not all cases, the checks were never presented for payment. Zwebner constructed a list of 40 IPO subscribers, each of whom purportedly purchased 62,500 shares (totaling 2.5 million shares). At least 24 of the so-called subscribers – and most likely all 40 –never purchased Crown shares. Zwebner knew, or was reckless in not knowing, that the IPO subscriber list was nothing more than a make-believe list of shareholders who never actually purchased the stock.

23. Zwebner then provided the fabricated IPO shareholder list to Crown's transfer agent, along with a share issuance resolution purportedly signed by Crown officer Zehavi. The resolution directed the transfer agent to issue share certificates in the names of the 40 IPO subscribers and to ship them to Zwebner rather than the named shareholders. The transfer agent followed the instruction and, on or about October 24, 2011, sent all 40 share certificates to Zwebner. Most, if not all, of the individuals named on the share certificates never received them or even knew of their existence.

**C.     Zwebner Arranges for Crown's Stock to Trade Over-The-Counter**

24. The next phase in the scheme – one that was important to make the Crown shell valuable to any potential stock manipulator who would purchase it – was to create a trading market for the Crown shell.

25. The OTCBB is a quotation service for securities that are not listed or traded on NASDAQ or any other national securities exchange. While exchanges (such as NASDAQ and NYSE) have specific listing and maintenance standards that are stringently enforced, OTC quotation services (such as OTCBB) facilitate

quotation of unlisted securities. As such, any regulatory relationship between an OTC quotation service and the companies may be limited or non-existent.

26. For a company to have its securities quoted on the OTCBB, a Form 211 must be submitted to FINRA by a "market maker" regarding the company's securities. A market maker is a firm that stands ready to buy and sell a particular stock on a regular and continuous basis at a publicly quoted price. The market maker must demonstrate compliance with Rule 15c2-11 of the Exchange Act, 17 CFR § 240.15c2-11, before it can initiate a quote in a specific security. Rule 15c2-11 requires that a market maker have a reasonable basis to believe the information required is accurate in all material respects and from a reliable source.

27. On or about September 8, 2011 – the day after the Commission declared Crown's registration effective – Zwebner arranged for a broker-dealer to file a Form 211 regarding Crown's securities so that quotations could be published on the OTCBB. Zwebner was the broker-dealer's exclusive contact for information about Crown the broker-dealer needed in order to successfully clear the Form 211 with FINRA and commence publishing quotations regarding Crown's securities.

28. On or about September 14, 2011, the broker-dealer submitted a Form 211 regarding Crown's securities to FINRA. The application contained false information that Zwebner had provided to the broker-dealer including, for example:
- that Amir Rehavi was Crown's CEO;
- that Crown intended to license a toothbrush patent to third parties to design, manufacture and market the product; and
- that Crown had not entered into any discussions or negotiations concerning potential merger or acquisition candidates.

29. Those statements were false because Rehavi never acted as CEO; Crown did not intend any longer to pursue the toothbrush patent; and, less than a month earlier, Zwebner had arranged to sell the Crown shell. When Zwebner

provided this information to the broker-dealer he knew, or was reckless in not knowing, that it was untrue.

30. In a letter dated September 20, 2011, FINRA informed the broker-dealer that the Form 211 concerning Crown was deficient and requested additional information including the following:

- a current shareholder list;
- a statement indicating whether anyone controlled Crown's shares other than the named shareholders;
- details on Crown's IPO including copies of the IPO subscribers' checks reflecting payment for their Crown shares; and
- details on Crown's business plan.

31. On or about September 20, 2011, the broker-dealer sent FINRA's comment letter to Zwebner and wrote: "I will await your responses once they are available." Zwebner provided the broker-dealer with information to forward to FINRA.

32. In a letter dated October 26, 2011 but sent via overnight delivery the following day, the broker-dealer responded to FINRA's deficiency letter based on the information Zwebner had provided. Zwebner was fully aware of the contents of the letter because, before sending it to FINRA, the broker-dealer showed it to him. The letter included the following false information:

- the fraudulent shareholder list that Zwebner previously had provided to Crown's transfer agent;
- a statement misrepresenting that no one controlled Crown's shares other than the named shareholders;
- copies of the fraudulent IPO subscriber checks that Zwebner and his son had obtained from their acquaintances and a statement misrepresenting that the named officers/directors of Crown – rather than Zwebner and his son – had solicited the IPO subscribers and that

- 9 -

|   |   |
|---|---|
| 1 | they had purchased their shares. Based on information provided to it |
| 2 | by Zwebner, the broker-dealer represented the share certificates had |
| 3 | been delivered, without explaining that they had been sent to Zwebner |
| 4 | rather than to the named IPO subscribers; and |

- a detailed description of Crown's plan to license Crown's product to third-party manufacturers and marketers that omitted to state that Zwebner was in the process of selling the company and had no intention of following the stated business plan.

When Zwebner provided this information to the broker-dealer he knew, or was reckless in not knowing, that it was false.

33. On or about November 2, 2011, in reliance on the false information about Crown that Zwebner had funneled through the broker-dealer, FINRA cleared the Form 211, which allowed the broker-dealer to quote Crown's stock on the OTCBB and on OTC Link. The following day, the broker-dealer informed Zwebner Crown had received a clearance letter from FINRA.

34. Zwebner now had a valuable commodity to sell: A fully-registered shell company with 2.5 million free-trading shares, and a ready-made trading market into which the shares could be sold. He was ready to complete the sale of the Crown shell that he had arranged in August 2011.

**D.  Zwebner Sells the Crown Shell to Larson**

35. In mid-November 2011, Zwebner had not yet completed the sale of the Crown shell that he had announced to Crown's auditor three months earlier. On or about November 16, 2011, when the auditor asked Zwebner to pay long overdue bills, Zwebner responded that he would pay "[a]s soon as Crown will be sold . . . ." The sale was completed a month later.

36. On or about December 6, 2011, Larson wired $300,000 from a bank account titled to an entity he controlled to the trust account of an attorney, which reflected that payment was for Crown. Two days later, the attorney wired $25,000

to Zwebner. On December 14, 2011, the attorney wired an additional $206,127 to Zwebner through a financial cash change house in Jerusalem. On December 15, 2011, Larson wired an additional $25,000 from the same bank account he controlled to another of the attorney's trust accounts.

**<u>Zwebner's Scienter: Other Wrongful Acts Demonstrating Zwebner's Intent to Fraudulently Create Public Shell Companies</u>**

37. Zwebner knowingly or recklessly failed to disclose his control of Crown and ownership of its stock in filings with the Commission. He also knowingly or recklessly misrepresented that there were no plans to sell the company and that the IPO subscribers were nothing more than a make-believe list of shareholders who never actually purchased the stock. He also knowingly or recklessly provided false information to the broker-dealer who in turn provided the information to FINRA.

38. Crown was not Zwebner's only foray into the public shell company creation business. In several other instances in roughly the same time period in which he launched Crown, Zwebner also created other phony shell companies using the same blueprint he used for Crown.

39. For example, Zwebner arranged sham registered offerings for the following shell companies:

- Dynamic Applications Corp. now known as OWC Pharmaceutical Research Corp. by virtue of a name change amendment agreed to on November 25, 2014 (trading symbol OWCP) (registration effective on May 15, 2008);
- Dynamic Ventures Corp. (registration effective on March 29, 2010);
- Advanced Ventures Corp. (registration effective on May 10, 2011);
- Safecode Drug Technologies Corp. (registration effective on December 27, 2011); and

- Baby All Corp. now known as Santa Fe Petroleum, Inc. (trading symbol SFPI).

40. In his activities concerning these shell companies, Zwebner's conduct demonstrated the same pattern and practice he followed in setting up Crown. For example, Zwebner caused registration statements to be filed with the Commission, representing the companies would conduct IPOs and that they owned or had been assigned patents (or pending patents) for products they purportedly planned to develop. In each case he took physical possession of the named officers' share certificates that represented all of the outstanding shares before the IPO. As with Crown, none of the registration statements filed with the Commission for these companies identified Zwebner as a principal or even mentioned him at all.

41. After the companies' registrations became effective, Zwebner took physical possession of the share certificates for stock that was purportedly sold to IPO investors. As with Crown, at least some of the purported IPO investors were Zwebner's nominees who were unaware they had been listed as shareholders.

42. Zwebner arranged for each of the companies' shares to be traded over-the-counter in the U.S., and he then sold some of the companies to third parties.

## **COUNT I**

## **Fraud in Violation of Section 17(a)(1) of the Securities Act**

43. The Commission repeats and realleges Paragraphs 1 through 42 of its Complaint.

44. From no later than September 2010 through December 2011, Zwebner, in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly knowingly, willfully or recklessly employed any device, scheme or artifice to defraud.

45. By reason of the foregoing, Zwebner violated, and, unless enjoined, is reasonably likely to continue to violate, Section 17(a)(1) of the Securities Act, 15 U.S.C. § 77q(a)(1).

## COUNT II

### Fraud in Violation of Section 17(a)(2) of the Securities Act

46. The Commission repeats and realleges Paragraphs 1 through 42 of its Complaint.

47. From no later than September 2010 through December 2011, Zwebner, in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly knowingly, willfully, recklessly, or negligently obtained money or property by means of untrue statements of material facts or omissions to state material facts necessary to make the statements made, in the light of the circumstances under which they were made, not misleading.

48. By reason of the foregoing, Zwebner violated, and, unless enjoined, is reasonably likely to continue to violate, Section 17(a)(2) of the Securities Act, 15 U.S.C. § 77q(a)(2).

## COUNT III

### Fraud in Violation of Section 17(a)(3) of the Securities Act

49. The Commission repeats and realleges Paragraphs 1 through 42 of its Complaint.

50. From no later than September 2010 through December 2011, Zwebner, in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly knowingly, willfully, recklessly, or negligently engaged in transactions, practices and courses of business which operated or would have operated as a fraud or deceit upon the purchasers and prospective purchasers of such securities.

51. By reason of the foregoing, Zwebner violated, and, unless enjoined, is reasonably likely to continue to violate, Section 17(a)(3) of the Securities Act, 15 U.S.C. § 77q(a)(3).

## COUNT IV

### Fraud in Violation of Section 10(b) and Rule 10b-5(a) of the Exchange Act

52. The Commission repeats and realleges Paragraphs 1 through 42 of its Complaint.

53. From no later than September 2010 through December 2011, Zwebner directly and indirectly, by use of any means or instrumentality of interstate commerce, or of the mails, knowingly, willfully or recklessly employed any device, scheme or artifice to defraud in connection with the purchase or sale of any security.

54. By reason of the foregoing, Zwebner violated, and, unless enjoined, is reasonably likely to continue to violate, Section 10(b) and Rule 10b-5(a) of the Exchange Act, 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5(a).

## COUNT V

### Fraud in Violation of Section 10(b) and Rule 10b-5(b) of the Exchange Act

55. The Commission repeats and realleges Paragraphs 1 through 42 of its Complaint.

56. From no later than September 2010 through December 2011, Zwebner directly and indirectly, by use of any means or instrumentality of interstate commerce, or of the mails, knowingly, willfully or recklessly made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading in connection with the purchase or sale of any security.

57. By reason of the foregoing, Zwebner violated, and, unless enjoined, is reasonably likely to continue to violate, Section 10(b) and Rule 10b-5(b) of the Exchange Act, 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5(b).

## COUNT VI

### Fraud in Violation of Section 10(b) and Rule 10b-5(c) of the Exchange Act

58. The Commission repeats and realleges Paragraphs 1 through 42 of its Complaint.

59. From no later than September 2010 through December 2011, Zwebner directly and indirectly, by use of any means or instrumentality of interstate commerce, or of the mails, knowingly, willfully or recklessly engaged in acts, practices and courses of business which operated or would have operated as a fraud or deceit upon any person in connection with the purchase or sale of any security.

60. By reason of the foregoing, Zwebner violated, and, unless enjoined, is reasonably likely to continue to violate, Section 10(b) and Rule 10b-5(c) of the Exchange Act, 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5(c).

### RELIEF REQUESTED

**WHEREFORE**, the Commission respectfully requests the Court find Zwebner committed the violations alleged, and:

### I.

### Permanent Injunction

Issue a Permanent Injunction restraining and enjoining Zwebner, his officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them, and each of them, from violating the federal securities laws alleged in this Complaint.

### II.

### Disgorgement

Issue an Order directing Zwebner to disgorge all ill-gotten gains, including prejudgment interest, resulting from the acts or courses of conduct alleged in this Complaint.

## III.

## Penalty

Issue an Order directing Zwebner to pay a civil money penalty pursuant to Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), and Section 21(d) of the Exchange Act, 15 U.S.C. § 78u(d).

## IV.

## Penny Stock Bar

Issue an Order, pursuant to Section 20(g) of the Securities Act, 15 U.S.C. § 77t(g), and Section 21(d)(6) of the Exchange Act, 15 U.S.C. § 78u(d)(6), barring Zwebner from participating in any future offering of a penny stock.

## V.

## Officer and Director Bar

Issue an Order, pursuant to Section 20(e) of the Securities Act, 15 U.S.C. § 77t(e), and Section 21(d)(2) of the Exchange Act, 15 U.S.C. § 78u(d)(2), barring Zwebner from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act or that is required to file reports pursuant to Section 15(d) of the Exchange Act.

## VI.

## Further Relief

Grant such other and further relief as may be necessary and appropriate.

## VII.

## Retention of Jurisdiction

Further, the Commission respectfully requests the Court retain jurisdiction over this action and over Zwebner in order to implement and carry out the terms of all orders and decrees that may hereby be entered, or to entertain any suitable application or motion by the Commission for additional relief within the jurisdiction of this Court.

|     |                                      |                                              |
|-----|--------------------------------------|----------------------------------------------|
| 1   |                                      | Respectfully submitted,                      |
| 2   | DATED: April 26, 2016                | SECURITIES AND EXCHANGE COMMISSION           |
| 3   |                                      |                                              |
| 4   |                                      | By:  /s/ Patrick R. Costello                 |
| 5   |                                      |                                              |
| 6   |                                      | PATRICK R. COSTELLO<br>Attorney for Plaintiff |
| 7   |                                      | Email: costellop@sec.gov                     |

OF COUNSEL:

CAROLYN KURR
Maryland State Court E-file No. 9512130114
Email: kurrc@sec.gov
KEITH O'DONNELL
District of Columbia Bar No. 230003
Email: odonnellk@sec.gov

Division of Enforcement
Securities and Exchange Commission
100 F Street, N.E.
Washington, DC 20549
Telephone: (202) 551-7000
Facsimile: (202) 772-9245